IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA DURHAM | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  04 C 6627 |
| v. | ) | |
| THE LOAN STORE, INC., EQUICREDIT | ) | HONORABLE DAVID H. COAR |
| CORPORATION OF AMERICA, ALASKA | ) | |
| SEABOARD PARTNERS, L.P. and SN | ) | |
| SERVICING CORPORATION | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Now before this Court are Defendants motions to dismiss for failure to state a claim.

**I.    FACTS**[1]

On May 28, 1999, Brenda Durham took out a loan from TLS in the principal amount of approximately $62,400.00 (the "Loan"). The Loan was secured by a first mortgage ("Mortgage") on Durham's residence in Chicago, with Durham as mortgagor and TLS as mortgagee. The Mortgage was duly registered in Cook County, Illinois. (Compl. ¶ 3.)

In March 1999, plaintiff Brenda Durham was a single mother, living with her three children on the south side of Chicago, Illinois. Durham was the sole owner of a house previously owned by her father. After his death, Durham's siblings transferred their interests in the house to

---

[1] Unless otherwise specified, the facts provided in this opinion come from Plaintiff's complaint. For the purposes of deciding the motions to dismiss presently before the Court, they are taken as true. This Court is not, however, making findings of fact regarding the merits of the case at this juncture.

her by way of quitclaim deeds. The house had no mortgage liens on it, but Durham had fallen behind on her property taxes. Durham, who had only a few community college classes in addition to a high school diploma, had never taken out a mortgage before. She was not familiar with the financing process or the range of mortgage lending instruments in the market. (*Id*. ¶ 9-10.) A friend had told Durham, however, that defendant The Loan Store ("TLS") "helped people get loans." (*Id*. ¶ 11.)

Durham accordingly called TLS's West 103rd Street branch in Chicago in March 1999, and arranged to meet with TLS vice president, Janice Caldwell, at Durham's home. During that meeting, Durham told Caldwell she wanted to take out a loan for $5,000-6,000.00 to pay her back property taxes. (*Id*. ¶ 12.) Caldwell asked about Durham's income. Durham stated that she received monthly public assistance, a food stamp allotment, and $50 in monthly child support, which she supplemented with irregular babysitting. (*Id*. ¶ 13.) Caldwell asked if Durham could "prove" her babysitting income but Durham replied that she and her neighbors customarily swapped babysitting, food, clothes, and furniture. (*Id*. ¶ 14.) When asked about her credit status, Durham indicated that she had no credit cards but believed she had good credit. She further stated that she had paid another lending company $100 in 1997 or 1998 to run a credit check but had been unable to pay the additional loan fees "up front" to get the desired loan, and did not know the results of the credit check. (*Id*. ¶ 15.) In addition, she told Caldwell she could not pay any money "up front" for a loan in 1999. Caldwell explained that fees and expenses could be deducted from the loan proceeds. (*Id.* ¶ 16.)

Durham gave Caldwell a tour of the house and premises. The first floor was uninhabitable due to a fire in 1995, which had caused over $10,000 worth of damage. Durham

and her children lived on the second floor. Because she did not have homeowner's insurance, Durham paid for repairs and minor renovations out of pocket when she could afford them. Substantial repairs were necessary. Durham estimated that the house and property were worth approximately $50,000, based on her property tax assessment. She indicated that she would like to run a childcare business from her home once she fixed it up. Caldwell then suggested that Durham seek a $30,000-40,000 loan to not only pay her back taxes but also make needed repairs to the house. (*Id.* ¶ 17, 21-22.) During the visit, Caldwell partially filled out a loan application form with Durham's information. She took the incomplete form with her when she left, leaving no copy for Durham. (*Id.* ¶ 20.)

During the March 1999 meeting, Caldwell failed to discuss loan options or explain concepts like fixed versus variable interest rates, balloon payments, processing fees, and amortization, among others with Durham. (*Id.* ¶ 25.) Durham told Caldwell she wanted a fixed rate loan because she had been told that was what she should request. She expressed a desire to pay off any loan in 15 years, although Caldwell told her payoff times ranged from 15 to 30 years. (*Id.* ¶ 26.) After the meeting, Durham heard nothing from Caldwell for several weeks. At the time, Durham had no telephone and could not get one because she had an outstanding balance with Ameritech. Caldwell arranged to have a telephone company employee establish phone service at Durham's house in the name of "Mary Wilson," whom Durham did not know. The phone service was disconnected at some point after the Loan closing. In late March or early April 1999, Durham contacted Caldwell for an update. Caldwell told Durham that Durham's credit was "good" and that an appraiser would be coming to appraise Durham's house and property. At some point thereafter, a male appraiser whom Durham understood had been sent by

Caldwell came to Durham's house. The front door windows and two windows on the first floor were boarded up at the time from the 1995 fire. The garage needed entrance and front doors. The appraiser, however, spent almost all of his 30 minute visit standing in one spot in the basement, taking notes. When Durham asked if he wished to tour the house, he said he could see all he needed. He did not tour the second floor or the rest of the first floor. He did not take room dimensions. He did not, to Durham's knowledge, examine the garage. (*Id.* ¶ 28.) Durham asked for a copy of the appraisal but was told she would receive one from TLS. Also in April 1999, a male insurance agent who stated he was from Farmers Insurance Group of Companies visited the house. He told Durham he was a friend of Caldwell's and that Caldwell had sent him to write a homeowner's policy. During his 15 minute visit, he said he did not need to see the interior of the house. He told Durham the only things that the house needed were a repair to the front door and some tuckpointing. The "agent" did not discuss coverage amounts or options or premiums. Shortly before the Loan closing, Farmers Insurance Group sent Durham a letter stating that it would not cover the house because of outstanding repairs that must be made. (*Id.* ¶ 29.)

In mid-May 1999, Caldwell told Durham that her loan had been approved and that the package was being express mailed to TLS' office. Caldwell did not request any additional information from Durham, but told her that the Loan had to be closed very quickly. Caldwell told Durham to go to Netco, a title company, on May 25, 1999, where she would meet Vernell Bradley, the TLS branch president, for the closing. (*Id.* ¶ 30.) Caldwell did not tell Durham the amount of the loan, but asked how much Durham could pay per month. Durham stated she could pay $350 to $400 per month. (*Id.* ¶ 31.)

On the afternoon of May 25, 1999, Caldwell drove Durham to the closing ("Initial Closing") at Netco, where Bradley and a Netco employee were also present. Prior to the Initial Closing, Durham had not seen any loan documents or even a copy of the loan application. At the Initial Closing, Caldwell informed Durham, for the first time, that the loan amount was $62,400, approximately double the amount Durham had anticipated. The monthly payments were approximately $730 per month. Durham indicated that she would "try to find a way" to pay them, based on her desires to start a licensed childcare business and find a tenant for one floor of her house. Caldwell directed Durham to sign the loan documentation quickly because Netco was about to close for the day. Durham did not have the opportunity to review any of the many documents at any length, and was confused by a number of discrepancies she saw in the paperwork and by the closing process itself. (*Id.* ¶ 32-36.)

Specifically, Durham noted the following discrepancies in the loan paperwork: the loan amount was double what she anticipated, as were the monthly payments; the loan application showed an income of almost four times what she had estimated for Caldwell; the valuation of the property was double what she had anticipated; the papers reflected that Durham had been employed for five years, which was not what she had told Caldwell; there were conflicting truth in lending disclosures, one of which reflected a balloon payment of over $55,000 due at the end of the amortization period; and the loan application and Real Estate Settlement Procedures Act of 1974 Statement showed sums due to Prime Professionals (for $5,122) and Process Works (for $5,800) plus an additional RESPA Statement debit for "sold 1995-Ist 1998 property taxes" ($7,648.79), when Durham had never heard of Prime Professionals or Process Works. Durham questioned Caldwell about these items and was told that the income and assets figures were

necessary to get the loan but that Durham did not need to report these inflated amounts to the IRS. Caldwell described the employment history also as necessary for the loan. With regard to the sums earmarked for Prime Professionals and Process Works, Caldwell stated that those were sums third parties had expended to purchase Durham's back property taxes and that Durham would be refunded any overpayments and should not worry. As for the balloon payment, Caldwell told Durham she could refinance the mortgage at any time. Durham asked Caldwell how she got the loan approved and said she did not want to get in trouble or be hurt; she was told there were "things" Durham did not need to know. (*Id.* ¶ 37-38.) After signing the documents, Durham was told the check was "on its way." (*Id.* ¶ 39.)

After Durham left the Initial Closing, she became increasingly concerned about the unanswered questions regarding the loan and the paperwork. She asked her brother, Calvin Durham, to review the paperwork. On May 26, 1999, Durham filled out the Notice of Right to Cancel form in her packet and faxed it to Caldwell. That evening, Caldwell telephoned Durham and berated her for cancelling the loan after all the time and effort Caldwell had expended. Caldwell implied that Durham should be afraid she would lose her house when her back taxes came due in August if she did not accept the loan. Durham agreed to return to Netco on May 28, 1999, to close on the loan again. (*Id.* ¶ 40-43.)

On May 28, 1999, Durham and her brother, Calvin, met with Bradley and the same Netco employee for the second closing. Caldwell was not present. Papers from the Initial Closing and the Second Closing were intermingled. Bradley directed Durham to tear up her documents from the Initial Closing, which she partially did. Again, the emphasis was on getting the paperwork signed quickly and pressing time constraints; Durham was directed to backdate all the

documents to May 25, 1999. This time, Bradley additionally told Durham she would have to write a letter explaining how she wished to use the loan proceeds. Durham was unable to write a letter that met Bradley's approval and review and sign all the forms at the same time, so Bradley dictated a letter to Calvin Durham which Plaintiff was directed to sign. The letter stated that Durham would make improvements, purchase kitchen fixtures, fence her yard, rebuild the garage, and remodel the basement with a wet bar and his and her's showers. Durham did not know what a wet bar was and she already had a shower in her basement. Durham again questioned the figures about income, employment status, loan amount, real property taxes and the balloon payment, but Bradley told her only Caldwell could answer those questions. In addition, Durham questioned additional fees listed on the Second Closing documents and was told that they reflected the cost of generating new paperwork. At the conclusion of the Second Closing, Durham was given a check for $36,459.03, representing the remaining loan proceeds.

After the Initial and Second Closings, Durham had signed two conflicting loan applications, two conflicting RESPA Statements, four conflicting truth in lending statements, a good-faith estimate, two conflicting itemizations of amount financed, two conflicting estimates of fees and costs, an escrow election letter, an escrow disclosure agreement, and an impound account agreement, and three directions of where to send her monthly payments, each of which bore a different company name and address and amount. In addition, Durham signed a Home Ownership and Equity Protection Act of 1994 ("HOEPA") Acknowledgment of Receipt of Notice with regard to Regulation Z with a date of receipt noted as May 20, 1999, although Durham did not receive the document prior to the Initial Closing. (*Id.* ¶ 50.) After reviewing these documents in early June 1999, Durham called Caldwell to ask about discrepancies.

Caldwell responded that the documents from the Second Closing had to be redone. Durham attempted to make a loan payment as directed by Caldwell, but her check was returned with a letter stating that the company listed had not yet purchased her loan. In addition, although Caldwell continued to assure Durham that any overpayment for back taxes would be refunded, Durham received nothing from either Prime Professionals or Process Works. Netco, which initially withheld $7,648.79, eventually refunded $2,514. When Durham requested a copy of the property appraisal, Caldwell refused to provide it because Durham had paid for it out of the loan proceeds and not "up front."

On about July 28, 1999, a woman named "Angela" called Durham and identified herself as being from the main TLS office in St. Louis, Missouri. Angela stated that she needed to verify information about Durham's income and employment, and that Durham needed to sign four letters from her "employers" and two payoff letters from the "two companies who did work for her." At Durham's request, Angela sent a copy of the loan file to Durham via overnight mail. The four letters purport to state that the signatory individuals paid Durham weekly amounts for childcare services. Durham did not know any of the signatories and had never seen the letters before. The two payoff letters were on plain paper and purported to be statements from Prime Professionals and Process Works, respectively, that they had performed work for Durham and had an unpaid balance. In early August 1999, Calvin Durham went to the addresses listed on the letters for Prime Professionals and Process Works. The Prime Professionals address did not exist and the Process Works address was that of an elderly woman who had lived there for thirty years. TLS personnel reported that checks to Prime Professionals and Process Works had been cut at the Second Closing and had been cashed. Durham never received any refund of these

amounts. Pursuant to a subpoena in the prior state litigation, Durham discovered that the authorized signatory on the TCF Bank account for Prime Professionals was Janice Caldwell; the authorized signatory on the TCF Bank account for Process Works was Vernell Bradley.

Although Durham had been told at the Second Closing that she had homeowners' insurance and at least one of the RESPA Statements reflected an escrow account and premium payment for insurance, TLS personnel informed Durham after the Second Closing that she did not have insurance or a tax escrow account. (*Id.* ¶ 64.)

Shortly after the Second Closing, the Mortgage was assigned to defendant Corporation of America ("EquiCredit"). On March 10, 2000, EquiCredit filed to foreclose the Mortgage against Durham in the Chancery Division of the Circuit Court of Cook County, Illinois. EquiCredit filed an amended complaint against Durham and others approximately nine weeks later. (Id. ¶ 5-6.) On November 1, 2000, Durham filed a Third-Party Complaint against TLS, alleging violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*, and misrepresentation, fraud, and deceit. (Id. ¶ 8.) Durham also filed affirmative defenses of violations of the Illinois Consumer Fraud Act against the amended foreclosure complaint. She realleged these claims in her Third Amended Third-Party Complaint, filed January 13, 2003. (*Id.* ¶ 8.) In March 2004, Plaintiff voluntarily dismissed her state court complaint on March 8, 2004, and re-filed on May 26, 2004. (Pls.' Resp. to Def. EquiCredit's Mot. to Dismiss, at 4.)

On February 16, 2002, EquiCredit assigned the Loan secured by the Mortgage and associated servicing rights to Alaska Seaboard Partners L.P. and SN Servicing Corporation (collectively "Alaska"). Alaska is the current creditor of the mortgage note. (Compl. ¶ 7.) In her May 26, 2004 complaint, Durham named Alaska as a defendant and alleged claims arising from

violations of the HOEPA, 15 U.S.C. § 1602(aa) *et seq*. for the first time. She also alleged claims based on the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.; misrepresentation, fraud, and deceit; and negligent hiring and supervision against all three defendants. Alaska removed the action to federal court. Presently pending before this Court are motions to dismiss from TLS, EquiCredit, and Alaska.

## II.   LEGAL STANDARD

The purpose of a motion to dismiss under Rule 12(b)(6) is to "test the sufficiency of the complaint, not to decide the merits" of the case. *Triad Assocs., Inc. v. Chicago Housing Auth*., 892 F.2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, a court must construe all allegations in the complaint in the light most favorable to the plaintiff and accept all well-pleaded facts as true. *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir. 1993). A complaint should be dismissed only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.  ANALYSIS

Defendants move to dismiss Plaintiff's complaint for failure to state a claim pursuant to Rule 12(b)(6). They allege that HOEPA does not apply to the loan to Plaintiff and that, in any event, her HOEPA claim is time-barred by a one-year statute of limitations. EquiCredit and Alaska assert that they are not liable under HOEPA's assignee liability provisions. In addition, all Defendants assert that Plaintiff admits facts demonstrating that she actively participated in any fraudulent conduct with respect to the loan and therefore cannot bring any of her claims. Further, EquiCredit and Alaska assert that the deceptive business practices claim must be

dismissed because Durham failed to allege that they actively or directly participated in any of TLS' alleged fraud. Finally, defendants assert that the economic loss doctrine bars Durham's negligent hiring and supervision claims. For her part, Durham contends that the statute of limitations argument is meritless because the instant case was timely filed under applicable Illinois law. Further, she contends that the statute of limitations is subject to equitable tolling and asserts that Defendants made false representations that were undiscovered until discovery began in the prior state court litigation. Durham asserts that HOEPA's applicability is facially apparent from the loan documents such that defendants' arguments are disingenuous. In addition, she opines that she has alleged sufficient facts to state a claim for deceptive business practices, fraud, and negligent hiring and supervision against all defendants.

### A. Home Ownership and Equity Protection Act Claims

#### 1. Applicability of HOEPA

##### a. General Applicability

In support of this position, they assert that the loan does not meet the statutory "Points and Fees trigger." 15 U.S.C. § 1602(aa)(1)(B). Section 1602(aa)(1) defines a mortgage as "a consumer credit transaction that is secured by the consumer's principal dwelling," with certain specified exceptions, if either the annual percentage rate ("APR") meets a required threshold above the Treasury yield at the time of credit application or "the total points and fees payable by the consumer at or before closing will exceed the greater of 8 percent of the total loan amount; or $400." 15 U.S.C. § 1602(aa)(1). According to Defendants, Plaintiff has alleged nothing to suggest that any of the "points and fees" defined in the statute should be included for purposes of determining the applicability of the statute. This mischaracterizes Plaintiff's complaint. Durham

specifically pled that the "points and fees" trigger had been met, including the almost $11,000 paid to Prime Professionals and Process Works as an apparent kickback. It is reasonable to read Plaintiff's complaint as alleging that the payments to Prime Professionals and Process Works were designed to manipulate the points and fees calculation in exactly the way that Defendants attempt to do: that is, that they served as kickbacks to TLS while permitting TLS to argue that it kept the points and fees at just under the 8% trigger amount. Further, it is reasonable from the complaint to determine that Plaintiff will be able to demonstrate that the payments to these two entities, which were listed as creditors in her loan file documents, were little more than disguised broker's fees or kickbacks to TLS and others. *See Cunningham v. EquiCredit Corp. of Ill.*, 256 F. Supp. 2d 785, 793 (N.D. Ill. 2003). This Court finds that Plaintiff has properly pled Count III.

**b.      Assignee Liability**

Defendants EquiCredit and Alaska contend that as assignees, they are not liable under HOEPA. 15 U.S.C. § 1641(d)(1). They assert that the applicability of HOEPA was not apparent on the face of the relevant loan documents as required for assignee liability. 15 U.S.C. § 1641(d); *Jenkins v. Mercantile Mortgage Co.*, 231 F. Supp. 2d 737, 746 (N.D. Ill. 2002). Plaintiff contends however that the loan documents received by EquiCredit and Alaska included a HOEPA Notice to Assignee, signed by Plaintiff, which served to put them on notice that the HOEPA applied to the loan. In addition, she avers that the points and fees charged by TLS exceeded 8% of the principal balance of the loan, the threshold for HOEPA applicability, and that this was both facially apparent from the loan documents and well-pled in her complaint. For the reasons discussed regarding the applicability of HOEPA above, this Court finds that Plaintiff

has properly pled Counts VII and XI. This is not to say that Plaintiff will necessarily prevail on these counts; but that is not the question presently before this Court.

### c. Statute of Limitations

All three defendants seek dismissal of Plaintiff's HOEPA claims as time-barred. HOEPA contains a one-year statute of limitations that starts to run "from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). They point to the five-year delay between when Plaintiff received the loan in May 1999 and when Plaintiff filed the instant complaint in May 2004. For her part, Durham contends that a savings statute in Illinois law established a "grace period" during which her claim was preserved after she voluntarily dismissed her prior state court case. 735 ILCS 5/13-217. This argument is specious because Plaintiff did not bring a HOEPA claim in her prior case, so there was nothing to "save." But Plaintiff also alleges that equitable tolling applies because defendants committed acts of misrepresentation and active fraudulent concealment which prevented her from learning of the HOEPA violations before she filed this present complaint. In addition, the Seventh Circuit has taken the position that the statute of limitations, as an affirmative defense, "is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). Taking all the facts in the complaint as true and making all reasonable inferences in Plaintiff's favor, this Court finds that Plaintiff has pled sufficient facts to raise an equitable tolling or equitable estoppel argument. Thus, Counts III, VII, and XI are properly pled.

### B. Illinois Consumer Fraud and Deceptive Business Practices Act Claims

The Consumer Fraud Act is a regulatory and remedial statute that is designed to protect consumers, borrowers and business persons from fraud, unfair methods of competition, and other

unfair and deceptive business practices. It is meant to be construed liberally to effectuate its purpose. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996). The elements of a Consumer Fraud Act claim are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce. *Connick*, 675 N.E.2d at 593. This Court finds that Plaintiff has pled the required elements of the Act.

TLS asserts that Plaintiff cannot assert claims against it under the theory of *respondeat superior* because it is not liable for acts that are outside the scope of an employee's employment; are unforeseeable by the employer; or are clearly inappropriate. *Wendell Wright v. City of Danville*, 675 N.E.2d 110, 117-18 (Ill. 1996). Moreover, when an employee's wrongful action represents an exceedingly marked or unusual deviation, the employee may be found to be outside the scope of his or her employment. *Id.* at 118. Plaintiff responds that "in all probability, hundreds of businesses have been found liable under the Consumer Fraud Act due to the acts of their employees" and asserts that her claim should not be dismissed. (Pl.'s Resp. to TLS' Mot. to Dismiss, at 5.) But Plaintiff fails to cite even one of these "hundreds of cases." This does not doom Plaintiff's claim, however, because a motion to dismiss simply tests the complaint; it does not go to the merits of the claims. Durham focuses instead on the question of whether she pled fraud with sufficient specificity. She relies on *Cunningham v. EquiCredit Corp. of Illinois*, 256 F. Supp. 2d 785 (N.D. Ill. 2003), to demonstrate that she did plead sufficient facts to support a common law claim against TLS. *Id.* at 792. As in *Cunningham*, this Court finds that Plaintiff has pled sufficient facts to support a claim of Consumer Fraud Act violation. Specifically, she pled that TLS deceived her about the terms, conditions, and fees of the loan, that TLS intended for her

to rely on the deception and close on the loan, and that the deception occurred in the course of commerce. Thus, Count I is properly pled.

Alaska and EquiCredit contend that they cannot be held liable under the Illinois Consumer Fraud Act because they were not the actual perpetrators of the alleged fraud. 815 ILCS 505/10a(a). The Supreme Court of Illinois held that even parties that knowingly received the benefits of another's fraud could not be held liable under the Consumer Fraud Act. *Zekman*, 695 N.E. 2d at 859. An assignee may be sued under ICFA only "where the assignee's fraud is active and direct." *Jackson v. S. Holland Dodge, Inc.*, 755 N.E.2d 462, 470 (Ill. 2001). Plaintiff notes, however, that under HOEPA, defendant assignees are subject to all claims and defenses that Plaintiff has against defendant TLS, the mortgage originator. 15 U.S.C. § 1641(d)(1). EquiCredit responds that HOEPA does not extend liability under ICFA to "innocent assignees." (EquiCredit Br. In Supp. of Mot. to Dismiss, at 13) (citing *Dowdy v. First Metro. Mortgage Co.*, No. 01 C 7211, 2002 WL 745851, at *3 (N.D. Ill. Jan. 29, 2002); *Bank of New York v. Heath*, No. 98 CH 8721, 2001 WL 1771825, at *2 (Ill. Cir. Oct. 26, 2001). Plaintiff notes that another judge in the Northern District of Illinois has rejected this position, finding that derivative liability based on the assignor's conduct governed assignee liability based on the plain language of the statute. *See Pulphus v. Sullivan*, No. 02 C 5794, 2003 WL 1964333, at *21 (N.D. Ill. Apr. 28, 2003). But Judge Plunkett goes on to say "there is nothing in the *Zekman* opinion that suggests mortgage assignees are exempt from its holding" and holds that "[b]ecause [Plaintiff] has not alleged that [Defendants], directly or though their agents, made material misstatements of fact to her, she has not stated viable Consumer Fraud Act claims against these defendants." *Id.* This

Court finds Judge Plunkett's reasoning persuasive. For this reason, Counts V and IX are dismissed.

### C. Common Law Fraud/Misrepresentation

Defendants argue that Plaintiff knowingly participated in much of the supposed misrepresentations. Specifically, Plaintiff states in her complaint that she raised questions in both the Initial and Second Closings about a number of "discrepancies" in the loan documentation, but signed the papers anyway and accepted a check for more than $36,000. Thus, Defendants assert that Plaintiff, having benefitted from the alleged fraud, cannot now allege that she reasonably relied as a matter of law on TLS' alleged misrepresentations. The question of whether a party's reliance was reasonable is usually one of fact, unless the facts admit of only one possible interpretation. Plaintiff counters, however, that her Count VI pleads with specificity all the elements of fraud: false statements of material fact, knowledge of falsity, intent to induce reliance, reasonable reliance, and damages. Taking the facts of the complaint as true, as it must for the purposes of a motion to dismiss, this Court finds that Plaintiff has properly pled Counts II, VI and X.

### D. Economic Loss/Negligent Hiring and Supervision Claims

Defendants argue that Plaintiff's negligence claim is barred by the economic loss doctrine and therefore should be dismissed. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982). Specifically, defendants contend that Plaintiff's claim does not fall into any of the three recognized exceptions to the *Moorman* economic loss doctrine. *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197 (Ill. 1997) (applying *Moorman* doctrine to service industry when contract defines duties of party). Plaintiff responds that mortgage

contracts carry "an implied duty of professional competence" which arises "independently of a contract" and thus falls in an exception to the *Moorman* doctrine. *Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863, 875 (N.D. Ill. 2002). This Court finds *Ploog* persuasive on this point and finds that Plaintiff has pled sufficient facts to establish a claim for negligent hiring and supervision. Specifically, she pled that TLS informed her that it was going to establish an escrow account on her behalf and seek homeowners' insurance, but did not do so. This constitutes a breach of fiduciary duty that is not barred by the economic loss doctrine. *Ploog*, 209 F. Supp. 2d at 874-75. Counts IV, VII, and XII are properly pled.

**Conclusion**

For the foregoing reasons, this Court DENIES Defendants' motions to dismiss as to Counts I-IV, VI-VIII, and X-XII, and GRANTS the motions to dismiss as to Counts V and IX.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **September 30, 2005**